DAVID M. ROSENBERG-WOHL (Cal. Bar No. 132924)
HERSHENSON ROSENBERG-WOHL,
A PROFESSIONAL CORPORATION
3080 Washington St.
San Francisco, CA 94115
(415) 317-7756
david@hrw-law.com

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JONATHAN GROVEMAN, | Case No.: 2:24-cv-01421-DJC-AC |
| Plaintiff, | |
| vs. | **NOTICE OF MOTION FOR NEW TRIAL [FRCP 59]; MPA ISO MOTION** |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, MICHAEL V. DRAKE, GARY S. MAY, MARY CROUGHAN, RENETTA GARRISON TULL, CLARE SHINNERL, PABLO REGUERIN, AND DOES 1-10, | **APRIL 14, 2025**<br>**1:30 PM**<br>**CTRM 5, 14TH FL** |
| Defendants. | |

## NOTICE OF MOTION AND MOTION

TO DEFENDANTS AND TO THIS COURT:

PLEASE TAKE NOTICE that on Monday, April 14, 2025 or as soon thereafter as may be set by this Court, Plaintiff will and hereby does move for a new trial under Fed. R. Civ. P. 59. Given that judgment was entered upon an order of dismissal resulting from a motion to dismiss, Plaintiff seeks an order from this Court revoking its order of dismissal, **reissuing it as an order dismissing the complaint is its entirety with leave to amend,** and opening the resulting

judgment. That amended complaint would then be tested, most likely, by a renewed motion to dismiss by Defendants.

The basis for this motion is the attached proposed amended complaint, which contains significant enough additional detail to warrant re-briefing of any motion to dismiss. Put another way, the proposed amended complaint shows that the Court was mistaken in stating that it "cannot envision any set of facts consistent with the allegations of the complaint that would cure the defects identified above." The new allegations are plausibly sufficient, and they should be tested.

## MEMORANDUM OF POINTS AND AUTHORITIES

This Court dismissed Plaintiff's complaint without allowing even one attempt at amendment. Plaintiff has significantly amended his complaint; the supplemental allegations explain considerably the allegations deemed insufficient. This may be seen by comparing the allegations in the amended complaint to the arguments chiefly noted by the Court in its Order of dismissal:

<u>Equal Protection</u> [Order at 4-5]

The Court determined there was no causal connection alleged between Defendants' actions and Plaintiff's exclusion. That has been addressed.

The Court determined that there was no allegation of discriminatory intent. That has been addressed.

The Court determined that failure by Defendants to prevent exclusionary conduct by a third party was insufficient for intentional allegation. That has been addressed.

The Court determined that there was no allegation that Defendants treated Jews differently. That has been addressed.

NOTICE OF MOTION FOR NEW TRIAL [FRCP 59]; MPA ISO MOTIONAPRIL 14, 20251:30 PMCTRM 5, 14TH FL - 2

Free Exercise [Order at 5-7]

The Court determined there was no allegation that Defendants had favored any religion or burdened Plaintiff's. That has been addressed.

The Court determined that Plaintiff's allegation that there was a counter demonstration on campus served to show that his free exercise had not been compromised. That has been addressed.

The Court determined that any effect upon Plaintiff's religious expression was too incidental and attenuated to be unlawful. That has been addressed.

Qualified immunity [Order at 7]

The Court noted that Plaintiff had not alleged that it was clear to Defendants that they were breaking the law. That has been addressed.

Title VI [Order at 7-10]

The Court determined that Plaintiff had no standing because he had not alleged he was an intended beneficiary of the college programming. That has been addressed.

The Court determined that Plaintiff had not alleged he was affiliated in any way with the university. That has been addressed.

ADA [Order at 10-12]

The Court determined that there were reasonable alternatives to accessing campus through its central artery. That has been addressed.

Conclusion

FRCP 15a states that leave to amend "shall be freely given when justice so requires." This is what justice requires here.

NOTICE OF MOTION FOR NEW TRIAL [FRCP 59]; MPA ISO MOTIONAPRIL 14, 20251:30 PMCTRM 5, 14TH FL - 3

Plaintiff respectfully submits that the allegations in the proposed amended complaint address sufficiently the concerns expressed by this Court that this Court should revoke its order of dismissal and open the resulting judgment and grant Plaintiff permission to file the amended complaint attached.

Dated this 4th of March, 2025.

/s/ David M. Rosenberg-Wohl

David M. Rosenberg-Wohl

HERSHENSON ROSENBERG-WOHL
A PROFESSIONAL CORPORATION

\DAVID M. ROSENBERG-WOHL (Cal. Bar No. 132924)
HERSHENSON ROSENBERG-WOHL,
A PROFESSIONAL CORPORATION
3080 Washington St.
San Francisco, CA 94115
(415) 317-7756
david@hrw-law.com

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN GROVEMAN, | Case No.: 2:24-cv-01421-DJC-AC |
| Plaintiff, | PROPOSED |
| vs. | **2D AM. COMPLAINT** |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, MICHAEL V. DRAKE, GARY S. MAY, MARY CROUGHAN, RENETTA GARRISON TULL, CLARE SHINNERL, PABLO REGUERIN, AND DOES 1-10, | |
| Defendants. | |

**JURISDICTION & VENUE**

1.    Plaintiff brings this action pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000d et. seq., and 42 U.S.C. § 12131 et seq.

2.    Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction of suits brought pursuant to 42 U.S.C. § 1983. Jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 because the causes of action arise under the Constitution and laws of the United States.

2D AM. COMPLAINT - 1

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, Defendants reside in the Eastern District of California and may be found and served in the Eastern District of California, and because a substantial part of the events, acts, or omissions giving rise to these claims arose in this District, County of Yolo.

**PARTIES**

4.    Plaintiff **Jonathan Groveman** is a resident of Davis, California, County of Yolo, and a member of the UC Davis community.

5.    Defendant **Regents of the University of California** is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California.

6.    Defendant **Michael V. Drake** is sued in his official capacity as President of the University of California.  As President, Defendant Drake oversees the University of California system, including UC Davis. Allowing the Encampment (defined in paragraph 12 below) that is the focus of this complaint is ultimately his responsibility; on information and belief he was aware of it and of the way in which it both dominated and thwarted access to the campus, and he chose to allow it to continue. By way of Plaintiff's contact with Regents Police representative Wade Stern, police were primed to intervene regarding the Encampment numerous times but were "waived off" by the Regents. On information and belief, this is a legacy of the "Pepper Spray" incident in which the UC Davis police used pepper spray against student demonstrators in a 2011 "Occupy movement" demonstration on campus to great public outcry leading to protestations by then current UC Davis

Chancellor Linda Katehi that the police had acted against her orders. The message "remember the pepper spray" was posted at the entrance to the Encampment.

7.    Defendant **Gary S. May** is sued in his official capacity as the Chancellor of UC Davis and in his individual capacity.  As Chancellor, Defendant May is the Chief Executive Officer for the Davis campus.  His duties include setting the policies, goals, and strategic direction for his campus, consistent with those of the University.  Allowing the encampment that is the focus of this complaint is in significant part his responsibility; on information and belief he was aware of it and of the way in which it both dominated and thwarted access to the campus, and he chose to allow it to continue pursuant to the official policy of Regents. In the exercise of his responsibility, May was constrained by no specific policies nor regulations that dictated his response to the Encampment, described below; his response was his own, making him personally complicit in the deprivation of Plaintiff's rights. On information and belief, May negotiated with the group that came to be known as the Davis Popular University for the Liberation of Palestine ("PULP") in advance of the Encampment being set up regarding its location, supplanting of the Whole Earth Festival that historically had taken place at that time and location – all outside of his authority. (In fact, May was so partial to PULP that he ceded to it the central privileged place on campus while relegating the Whole Earth Festival to an athletic field on the edge of campus requiring heightened security and attention due to the fact that young kids were now attending a UC Davis event in an open area abutting traffic.) On information and belief, as presented publicly by Davis Popular University for the  Liberation of Palestine ("PULP"), May subsequently reached a "settlement" with the  Regents – a settlement that was also outside of his authority. Plaintiff directly sought redress from May for the actions detailed herein

2D AM. COMPLAINT - 3

through his chief counsel Mike Sweeny and Chief of Police Joe Farrow, along with the Director of Support Services Christina Blackman. May never responded to Plaintiff.

8.  Defendant **Mary Croughan** is sued in her official capacity as Provost and Executive Vice Chancellor of UC Davis and in her individual capacity.  Defendant Croughan is responsible for UC Davis' day-to-day operations, as well as the planning, quality, and delivery of education provided to UC Davis' students, parents, alumni, and to the Davis community as a whole. Allowing the encampment that is the focus of this complaint is in significant part her responsibility; on information and belief she was aware of it and of the way in which it both dominated and thwarted access to the campus, and she chose to allow it to continue pursuant to the official policy of Regents. In the exercise of her responsibility, Croughan was constrained by no specific policies nor regulations that dictated his response to the Encampment, described below; her response was her own, making her personally complicit in the deprivation of Plaintiff's rights. According to defendant Reguerin, the Provost's office "took the lead" in fielding and addressing concerns arising out of the recent Israel-Palestine conflict; such a portfolio necessarily included the Encampment.

9.  Defendant **Renetta Garrison Tull** is sued in her official capacity as Vice Chancellor for Diversity, Equity and Inclusion and Co-Chair, Next Generation Campus Safety Task Force and in her individual capacity.  Allowing the encampment that is the focus of this complaint is in significant part her responsibility; on information and belief she was aware of it and of the way in which it both dominated and thwarted access to the campus, and she chose to allow it to continue pursuant to the official policy of Regents. In the exercise of

her responsibility, Tull was constrained by no specific policies nor regulations that dictated her response to the Encampment, described below; her response was his own, making her personally complicit in the deprivation of Plaintiff's rights. On information and belief, based upon both her public statements from 2021 and her recent conspicuous silence, Ms. Tull believes that anti-Zionism has nothing to do with antisemitism and that expression thereof is inherently not problematic under the First Amendment, and that expressing concern about the Encampment is inherently Islamophobic, that such beliefs have underscored her personal permission for the Encampment, and that her position is factually and legally unsupportable.

10. Defendant **Clare Shinnerl** is sued in her official capacity as Vice Chancellor for Finance, Operations & Administration and in her individual capacity. Allowing the encampment that is the focus of this complaint is in significant part her responsibility; on information and belief she was aware of it and of the way in which it both dominated and thwarted access to the campus, and she chose to allow it to continue pursuant to the official policy of Regents. In the exercise of her responsibility, Shinnerl was constrained by no specific policies nor regulations that dictated her response to the Encampment, described below; her response was her own, making her personally complicit in the deprivation of Plaintiff's rights. Shinnerl's portfolio includes safety on campus; on information and belief she was aware of the violent aggression (including stabbing with umbrella points) with which certain participants in the Encampment fended off interlocutors or documenters from the UC Davis community and did nothing about it.

11. Defendant **Pablo Reguerin** is sued in his official capacity as Vice Chancellor for Student Affairs and in his individual capacity. Allowing the encampment that is the focus of this

complaint is in significant part his responsibility; on information and belief he was aware of it and of the way in which it both dominated and thwarted access to the campus, and he chose to allow it to continue pursuant to the official policy of Regents. In the exercise of his responsibility, Reguerin was constrained by no specific policies nor regulations that dictated his response to the Encampment, described below; his response was his own, making him personally complicit in the deprivation of Plaintiff's rights. Reguerin was a fixture at the Encampment, lending both protection to it and encouragement to its participants, UC Davis affiliates or no. On at least one occasion he accused protestors among whose group is Plaintiff of exacerbating tensions on campus by documenting PULP activity, while he was visibly and demonstrably collegial to those within the Encampment. According to May, the office headed by defendant Reguerin is tasked with explaining responsible speech; in this role he has served to foster divisions rather than bring the parties together.

**FACTS**

12. By May 7, 2024, UC Davis negotiated to allow an encampment (the "Encampment") to be situated at the Quad, at the very center of campus life and transit. On information and belief, this was not done in accord with either Policy 400-10 (no overnight camping without permitting) or Policy 270-20 (permitting reservations).

13. Any student or member of the public wishing to traverse the campus through its central artery became compelled to encounter the Encampment and interact physically and emotionally with it.

    a. No student or member of the public either identifying as a Zionist or perceived as such was permitted to continue to proceed on the central artery and was instead

barred and turned away. No student or member of the public either identifying as a Jew or perceived as such was permitted to continue to proceed on the central artery and was instead barred and turned away unless that individual expressly denied any connection to Israel.

b. No student or member of the public either identifying as a Zionist or perceived as such was permitted to engage in peaceful dialog or conversation with those within the Encampment but instead were met with violence, including thrusted umbrella points.

c. Most Jews identify in some respect with Israel and as such can be considered (whether by themselves or others) Zionists.

d. The Encampment was designed to be, and in fact operated as a Jew-free zone dominating and interfering with access to campus.

e. Defendants knew all this and nonetheless agreed upon the establishment of the Encampment and its continued presence.

14. The Encampment was comprised of individuals, including both students and members of the public, who are vehemently opposed to the existence of the State of Israel, to any self-determination for Jews living in what is presently the State of Israel, the West Bank or the Gaza Strip, or any part of the British Palestinian Mandate historically occupied by Jews, proposed as a state for Jews, accepted as a state for Jews, and fought for as a state for Jews (often phrased as "From River to Sea"), and to the residence of anyone of Jewish within this land, whether by intent or effect. Defendants knew this, both in negotiating the Encampment and in allowing it to continue.

2D AM. COMPLAINT - 7

15.  The Encampment was comprised of individuals, including both students and members of the public, who are vehemently supportive of Hamas and its express desire to extinguish not just Israeli life within the geographic boundaries of the Israeli state but wherever they may live, whether in Israel proper or the West Bank or Gaza Strip, but even Israelis and Jews wherever they may live in the world. This is the text of the charter of Hamas, and it is the meaning of "Globalize the Intifada." Defendants knew this, both in negotiating the Encampment and in allowing it to continue.

16.  On information and belief, a significant number of the individuals who lived in the Encampment were not UC Davis students or members of the university community.

17.  By May 7, 2024, the Encampment was an exclusive zone, welcoming and tolerant only of like-minded extremists. The Encampment was maintained as a "Zionist-free zone" from which Zionists and those suspected of being Zionists were excluded and/or blocked. Any students or member of the public wanting to engage with the Encampment who did not express alliance with the Encampment's cause were rebuffed by furious personal attack, including by halting with hands on arms or bodies, by shoving, by weaponized umbrellas jabbed towards the face, and by screaming racially and ethnically charged invectives.

18.  By May 8, 2024, the Encampment was walled off on its southern side, creating a physical barrier to enhance the social barrier and eliminating the possibility for anyone to cross campus through the Quad.

19.  On or about June 20, 2024, around the close of the school year, the individuals responsible for the Encampment began to dismantle it. They did so following negotiations with Defendants to secure demands that were posted at the entryway during the first week that

erected the encampment, including: "Disclose and Divest: End UC Complicity" and "Total Academic and Cultural Boycott (Cancel Koret study abroad)," which demanded U.C. Davis to cut its ties to the State of Israel, and challenging the UC Davis veterinary school's "racist Zionist faculty members." As reported by the Davis Popular University for the Liberation of Palestine, these meetings "began a process for soliciting and implementing student feedback on the UC Davis Foundation's existing and potential future factors that could bar investments …" among other topics, while avoiding any written commitments. As reported by Chancellor Gary May: "The university facilitated a meeting between PULP student leaders and UC Davis Foundation trustees, who provided information about the University of California's investment principles and processes. In another meeting, representatives of the UC Davis Academic Senate provided insight into the ways faculty research is funded and the autonomy and academic freedom of individual researchers. In another meeting, leaders from the School of Veterinary Medicine shared the history and principles underlying the school's collaboration with a similar school in Jerusalem."

20.    Concerning the future semester(s), Chancellor May stated: "We remain committed to ongoing discussions with our students, transparency in university operations, and supporting students' rights to express their viewpoints. While we decry the loss of innocent life on both sides of this war, including in Israel, we acknowledge the efforts of our students to peacefully protest the humanitarian crisis and staggering loss of life in Gaza, the West Bank and Palestine. Protesting immense human suffering and destruction should not be conflated with hatred or intolerance."

**PLAINTIFF**

21.    Plaintiff is a member of the UC Davis community. Plaintiff is on the UC Davis campus regularly. As a member of the public living near UC Davis, Plaintiff has been welcomed

as a member of the UC Davis community. There are a number of activities that bring him there throughout each month. These include, but are not limited to, activities related to his full-time job (meetings and events), events related to his family (his daughter plays in the Davis high school orchestra and they are regularly on campus), exercise, and other non-work related campus events that he is eager to participate in. Plaintiff views the UC Davis as the cultural center of his life.

22. Plaintiff was on campus on May 7 to provide support for a counter dialogue against the Encampment and to support Jewish faculty and staff.

   a. Plaintiff had arranged with a few friends the day before, the first day of the Encampment, to come together to see what was going on with the Encampment and initiate a protest against it. Plaintiff was the one who brought paper, spray paint and pens for signs. They met up some 30 feet away from the entrance to the Encampment on the north side of the Quad, close to the Memorial Union.

   b. The moment he arrived, fully keffiyeh-masked individuals from the direction of the Encampment approached and began asking questions as to his purpose. He said he was observing. "Why?" they asked. The say the sign materials. "What signs" would he be creating? He stated that he was pro-Israel. "Zionists," they scremed. "You're not allowed to be here!" Three individuals approached, closely linked, pushing him back off the path and back on to the grass.

   c. Twenty minutes later or so he tried again to approach the Encampment. He wanted to enter and walk through to the other side. Encampment participants with walkie talkies identified him as a "Charlie" and gave his location by way of the

clock, as if this were some sort of military defense. Upon being quickly

approached, Plaintiff asked to go through to the other side.

d.  "No," he was told. This was a "no-Zionist" zone, a "restricted area." He was told

to go around.

e.  Plaintiff explained that for his own safety, he needed to stay on the concrete path.

f.  Plaintiff asked the identity of the masked individuals who had detained him. They

refused. Plaintiff asked to speak with the leader of the Encampment. He was told

he could not. He was accused of being a "Zionist," was told "Zionists are not

welcome," and to "go away."

g.  Three masked individuals from the Encampment closed in on Plaintiff with open

umbrellas, pushing out towards him. Plaintiff was struck twice in the face with the

sharp end of an umbrella.

h.  During this process, Plaintiff saw other individuals being chased away from the

Encampment and Encampment participants striking cell phones out of the hands

of those trying to film.

i.  Plaintiff never made it near the Encampment, much less was able to traverse the

Quad through the main artery. He and his group made some pro-Israel signs and

left them, affixed to stakes in the grass, and departed.

j.  Plaintiff sent an email to UCDPD Chief Farrow and the UCD Chancellor May

about the incident.

23.    As everyone within the encampment had their faces completely concealed by head cloths,

there was no way for Plaintiff to identify anyone involved in thwarting his access or

hitting him. Only two people within the Encampment are identifiable - Hannah Zeltzer

and Stanford McConnehey - but neither were the two he encountered at the "guard post" as described in paragraph 22 above.

24.     Due to Plaintiff's Veterans Administration service-connected disability, Plaintiff needs to refrain from activity on uneven surfaces. Navigating on the grass, and even on decomposed granite paths, puts him at risk of falling and injury due to instability. He is VA-rated for both knees, his lower and upper back areas, and he has Meniere's Disease, which gives him spells of vertigo.

25.     On May 10th, and again on May 14, Plaintiff wrote to UC Davis Chief Counsel Mike Sweeney. Mr. Sweeny did not respond. On May 17, Plaintiff received a response from Wendi Delmendo, UC Davis' Chief Compliance Officer in her role as ADA Coordinator. In this response, UC Davis accepted that the path through the Quad was inaccessible and told Plaintiff he was required to use a different path.

26.     On information and belief, student groups hostile to what they call Zionism and supportive of the military and political aims of Hamas have been gathering throughout the United States this summer to determine how best to continue protests, including encampments, in the upcoming Fall semester and beyond. News reports quote students involved in encampments threatening that encampments will return if universities do not accede to their demands. Based upon the results of the negotiation on or about June 20, 2024 that led to the dismantling of the Encampment, as reported above, there is every reason to believe that both the Encampment and the negotiations will continue at UC Davis.

27.     On August 19, 2024, Michael Drake, President of the University of California, wrote to the chancellors of each of the University of California campuses, including UC Davis, "directing each campus to provide, in a single document or webpage, a compilation of existing policies that most commonly apply to protest and demonstration activity. This information was to be

made available prior to the Fall 2024 academic term and include the following policy

requirements:

• _Camping or encampments: Policies must clarify that no person shall camp, set up or erect a campsite, or occupy a tent or other temporary housing structure on University property, unless specifically pre-approved.
• _Unauthorized structures: Policies must clarify that no person shall erect, build, construct, set up, establish and/or maintain unauthorized structures on University property.
• _Restricting free movement: Policies must clarify that no person shall restrict the movement of another person or persons by, among other means, blocking or obstructing their ingress or egress of roadways, walkways, buildings, parking structures, fire lanes, windows, doors or other passageways to university property, or otherwise denying a person access to a University facility or space.
• _Masking to conceal identity: Policies must clarify that no person shall wear a mask or personal disguise or otherwise conceal their identity with the intent of intimidating any person or group, or for the purpose of evading or escaping discovery, recognition, or identification in the commission of violations of law or policy.
• _Refusal to reveal identity: Policies must clarify that no person shall refuse to identify themselves while on University property to University officials who are acting in the performance of their duties in situations where assistance or intervention is needed.

I expect that most of our campuses have existing policies that cover the areas listed above. To the extent that this is not the case at your campus, your campus should develop and/or amend policies as soon as possible. Please note that the policy descriptions above are intended to be illustrative, and your own policies may use different language to achieve the same effect."

28.    The UC Davis academic year begins Monday, September 23. As of today, Tuesday, March 4, 2025, neither Defendant May nor any administrator at UC Davis has embraced the direction of Defendant Drake and the Regents regarding the development and/or enforcement of such regulations or policies.

29.    At the time of the filing of this complaint, May 17, 2024, UC Davis' website "freespeeech.ucdavis.edu/learn/policies" provided links to policies but a search for "encampment," "camping," and "overnight" yielded "no results." So too regarding a search for "mask" or "masking." As of today, there is a new website "freespeech.ucdavis.edu" that provides links.

30.   There is a new policy addressing "overnight camping," to be sure. *See* PPM 400-01 (IV.B.2.f), 8/21/24. On its face, this would appear to address the Regents' recent direction "that no person shall camp, set up or erect a campsite, or occupy a tent or other temporary housing structure on University property, unless specifically pre-approved" (*see* paragraph 28 above). But UC Davis had such a policy in place during the Encampment. *See* Section 400-01, dated 8/30/14, reissued 9/19/19 (IV.B.2.h), "Use of University properties for overnight camping is generally prohibited absent express permission by the University (see Section 270-20)." On information and belief, UC Davis didn't grant express permission for the Encampment under Section 270-20 yet embraced the Encampment anyway, contrary to policy. Nothing has changed: it's *still* against policy – there is no reason to think one policy will be enforced where the other was not, especially since the new UC Davis policy enumerates no consequences for an Encampment in violation of policy.

31.   More, the policies are expressly limited to RSOs. Davis Popular University for the Liberation of Palestine is not presently a registered student organization at UC Davis.

32.   Nor, in Defendant May's statement upon the dismantling of the Encampment, say May that students had violated any regulation or policy of the UC Davis; by contrast, he exclusively lauded the behavior of Encampment participants and touted his ability to negotiate fruitfully with them, stating "We remain committed to ongoing discussions with our students, transparency in university operations, and supporting students' rights to express their viewpoints." This statement, combined with May's silence regarding the recent Regents' directives, speaks volumes about his likely approach to future conflict – more of the same.

33.   There is a conflict of interest between Defendant May's role with UC Davis and his membership on the board of directors of Leidos, a company that works with the Israeli Ministry of Defense. Note: Plaintiff does not say that there is *anything* wrong with May's

2D AM. COMPLAINT - 14

board membership – just that it subjects him to repeated personal scrutiny (to resign from Leidos or as chancellor) and specifically to calls for him to resign and distance himself from the company. On information and belief, May tries to thread the needle between appearing to be supportive of Jewish/Israeli/those perceived as Zionists, because of the risk of heightening his personal exposure through Leidos, on the one hand, and supportive of what he would like to characterize as the free speech rights of those involved in the Encampment, on the other hand, which serves to insulate him from this personal exposure.

34. Indeed on or about November 7, Defendant May had told Students for Justice in Palestine criticizing his Leidos board membership as supporting genocide that while he didn't support genocide, the war in Gaza itself was "genocide" and that he would support SJP students "through this genocide." When confronted with evidence and argument that there was, in fact, no genocide taking place in Gaza, Defendant May showed he did not actually care about either the truth or the effect of embracing that word on campus, saying "Okay, I will use that word if it helps me get to my next talking point."

35. In short, if indeed UC Davis has attempted to comply with the Regents' recent directive, it has done so in a way to maximize its ability to allow an encampment as before out of its sympathy to one particular viewpoint over those of others and not put any safeguards in place to protect against an encampment that dominates campus, interferes with campus access, or otherwise is in violation of UC Davis policy.

**<u>COUNT I</u>**
**Violation of 42 U.S.C. § 1983 (Equal Protection Clause)**
**(on Behalf of Plaintiff Against Individual Defendants)**

36. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs 1-35.

1    37.    Under the Fourteenth Amendment to the United States Constitution, a State shall not

2    "deny to any person within its jurisdiction the equal protection of the laws." Defendants,

3    in their official capacities, work for the State. Defendants' rules, whether those of UC Davis

4    or the Regents, are the mechanism by which Defendants, as State actors, interact with the

5    public.

6    38.    In their official capacities, and (with the exception of Defendant Drake) in their personal

7    capacities, Defendants have denied Plaintiff equal protection of the laws, as secured by the

8    Fourteenth Amendment:

9        a.  Through policy and practice that treated non-Jews differently from Jews:

10            i. Regularly, Defendants have not distinguished between non-Jews and Jews

11                in the application of policy, whether that of UC Davis or that of the

12                Regents of the University of California. Non-Jewish organizations and

13                Jewish organizations alike are obligated to comply with rules and

14                regulations involving access to and use of campus property, posting of

15                materials, and time, place and manner restrictions for speech. Non-Jews

16                and Jews alike are protected from sexual harassment and disability

17                discrimination, both in terms of substantive policy and enforcement.

18            ii. Regarding the Encampment, this is the first time that Defendants have

19                tolerated such a distinction – and in this situation, Defendants have

20                actually promoted the distinction by negotiating with a non-RGO group

21                and favoring its viewpoint over that of those it offends and threatens.

22        b. Through policy and practice that treated Jews who reject Israel differently from

23            those who identify with Zionism:

i. Regularly, Defendants have not distinguished between Jews who reject Israel and Jews who identify with Zionism, whether through policy of UC Davis or that of the Regents of the University of California. All Jewish organizations alike are obligated to comply with rules and regulations involving access to and use of campus property, posting of materials, and time, place and manner restrictions for speech. All Jews alike are protected from sexual harassment and disability discrimination, both in terms of substantive policy and enforcement.

ii. Regarding the Encampment, this is the first time that Defendants have tolerated such a distinction – and in this situation, Defendants have actually promoted the distinction by negotiating with a non-RGO group that draws some progressive Jews who reject Israel and favoring that viewpoint over that of the majority of other Jews who find that message offensive and threatening.

c. Through policy and practice that treated a group identified with Palestinians differently from those who identified with Israelis.

i. Regularly, Defendants have not distinguished between groups identified with Hamas/Palestinians and groups identified with Israelis, whether through policy of UC Davis or that of the Regents of the University of California. Organizations of differing national and ethnic identities alike are obligated to comply with rules and regulations involving access to and use of campus property, posting of materials, and time, place and manner restrictions for speech. Palestinians and Israelis alike are protected from

2D AM. COMPLAINT - 17

sexual harassment and disability discrimination, both in terms of substantive policy and enforcement.

    ii. Regarding the Encampment, this is the first time that Defendants have tolerated such a distinction – and in this situation, Defendants have actually promoted the distinction by negotiating with a Hamas/Palestinian group to promote its viewpoint over that of the Israelis it wants to extirpate and eliminate.

d.  Defendants regularly have applied their policies (and those of Regents) to protect minorities such as African Americans or Muslims from discrimination and harassment.

    i.  Regarding the Encampment, Defendants knowingly agreed to accept and locate a significant, permanent, campus disruption that would exclude and antagonize all Jews who identify in some respect with Israel (i.e., most Jews).

e.  Defendants have regularly required other student groups comprised of minorities or those affiliated with them, whether comprised of African Americans or Muslims or Jews to apply for permits and otherwise conduct themselves in accordance with school policies (and those of Regents), including time, place and manner restrictions.

    i.  Regarding the Encampment, Defendants chose to bend to the pressure of a non-recognized group, negotiate with it, and hold it free of any obligations to comply with school policies such as applying for and agreeing to abide

by the rules attendant upon a permit, as well as time, place and manner restrictions.

    f.   Defendants ordinarily detain and investigate students and non-students on campus who violate campus rules.

        i.   Regarding the Encampment, Defendants chose not just to look the other way but embrace and promote the students and non-students articulating the pro-Hamas anti-Zionist/Jewish viewpoint expressed by the Encampment.

    g.   Defendants ordinarily take action when students sexually harass other students, or discriminate against them due, e.g., to gender, sexual orientation, race and disability, taking steps to prevent it, calling it out, and addressing it if it happens.

        i.   Regarding the Encampment, Defendants chose not just to look the other way but embrace and promote the students and non-students instilling fear and anxiety in Jews and Zionists on campus by articulating the pro-Hamas anti-Zionist/Jewish viewpoint through the Encampment while masking their identities.

39.   As a member of the UC Davis community who is a Jew and as a Jew who identifies with Israel and so considers himself and is considered a Zionist, Plaintiff has been denied protection under the laws applied by Defendants equally with others, namely non-Jews, Jews who reject Israel, and those who identify with Hamas/Palestinians, The Encampment could not have been established and would not have persisted had Defendants applied the law equally to PULP instead of granting it extraordinary favor. If

2D AM. COMPLAINT - 19

1
2

Defendants had applied the law equally, there would have been no Encampment and no Jew-free zone dominating and excluding access to the university.

3
4
5
6
7

40.    The law is sufficiently clear: the conduct alleged herein violates the Equal Protection clause. It is not just that the law is clear; the law has been applied consistently by Defendants until it adopted and promoted the Encampment. This knowledge is sufficient to impose liability on Defendants personally.

8
9
10
11
12

41.    As a result of Defendants' conduct, Plaintiff has suffered significant injuries. This includes emotional distress for assault and battery, not to mention harassment, as well as for the imposition upon Plaintiff of second-class inferior status by the State institution he calls home.

13
14

**COUNT II**
**Violation of 28 U.S.C. § 1983 (Free Exercise Clause)**
**(On Behalf of Plaintiff Against Individual Defendants)**

15
16
17

42.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs 1-41.

18
19
20
21
22

43.    Under the Fourteenth Amendment to the United States Constitution, the state may not thwart the right to express one's religious identity freely. The Free Exercise Clause of the First Amendment guarantees "the right to … profess whatever religious doctrine one desires." *Employment Div., Dept. of Hum. Res. of Or. v. Smith* 494 U.S. 872, 877 (1990).

23
24
25

44.    In their official capacities, and (with the exception of Defendant Drake, in their individual capacities), Defendants have deprived Plaintiff of the right to express his Jewish identity freely.

26
27
28

    a. Inherent to Judaism is the right to argue. Once the Defendants agreed to the Encampment and ratified political speech that was hostile to Jews and Judaism in

the center of campus, Plaintiff had the right to approach and engage, respectfully and safely. Judaism embraces disagreement: the Talmud is predicated upon it, preserving opposing views over the past two thousand years and constructing dialog even between individuals and schools of thought who did not live at the same time as each other.

b. Separately, Plaintiff had the right to express his Jewish identity *at* the Encampment, not segregated from it. This was not a situation where two opposing groups had separate but equal space; this was a situation where Defendants ratified one position that was hostile to Judaism and told the Jews who opposed it to sit at the back of the bus to protest.

45. The law is sufficiently clear: the conduct alleged herein violates the Free Exercise clause. It is not just that the law is clear; the law has been applied consistently by Defendants until it adopted and promoted the Encampment. This knowledge is sufficient to impose liability on Defendants personally.

46. As a result of Defendants' conduct, Plaintiff has suffered significant injuries. This includes emotional distress for assault and battery, not to mention harassment, as well as for the imposition upon Plaintiff of second-class inferior status by the State institution he calls home.

**COUNT III**
**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.**
**(On Behalf of All Plaintiff Against All Defendants) (no personal liability sought)**

47. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs 1-46.

2D AM. COMPLAINT - 21

48.    UC Davis receives financial assistance from the U.S. Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

49.    That Act states: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

50.    The establishment and toleration of the Encampment, as situated and allowed, violates Title VI because the individuals of the Encampment believe that Jews and Israelis are a race, that Jews and Israelis are inherently "white" of color, especially to the extent they identify with Zionism, and that Jews and Israelis have a "national origin" from anywhere that is not presently the State of Israel, most often identified as originating in Eastern Europe.

51.    Discrimination against Jews themselves is likewise prohibited under Title VI of the Civil Rights Act of 1964, as reflected in numerous written policies of the Department of Education's Office for Civil Rights. On November 7, 2023, OCR issued a new Dear Colleague Letter, reminding schools that receive federal financial assistance that they have a responsibility to address discrimination against Jewish, Muslim, Sikh, Hindu, Christian, and Buddhist students, or those of another religious group, when the discrimination involves racial, ethnic, or ancestral slurs or stereotypes; when the discrimination is based on a student's skin color, physical features, or style of dress that reflects both ethnic and religious traditions; and when the discrimination is based on where a student came from or is perceived to have come from, including discrimination based on a student's foreign accent; a student's foreign name, including names commonly

associated with particular shared ancestry or ethnic characteristics; or a student speaking a foreign language. . . Harassing conduct, the letter made clear, could be verbal or physical and need not be directed at a particular individual.

52. OCR makes clear that the illegal "harassment" that "creates a hostile environment" is that which "limits or denies a person's ability to participate in or benefit from the recipient's education program or activity."

53. The Encampment was constructed and operated as a locus of civic engagement, on campus, of those dedicated to a particular viewpoint. The purpose was to raise awareness within the UC Davis community. Its placement was designed to highlight the significance of the issue and to claim authority from the university itself. Its exclusion of Jews from the center of campus was similarly so designed. Authority for all this was in fact granted by the university in its negotiation for the time and place of the Encampment – and in allowing the Encampment to persist – despite singular lack of compliance with university rules and regulations. The Encampment drew participants from throughout the UC Davis community (including those who were not students there). Defendants knew all this.

54. Plaintiff is protected by Title VI as a Jew and a Zionist.

55. Plaintiff is protected by Title VI as a member of the UC Davis university community when he chooses to access the campus for its academic, cultural and civic environment just like students, administrators and faculty. His wife obtained her Masters' degree from UC Davis. His daughters swam on a team that met at the UC Davis pool. Plaintiff recently attended the UC Davis women's basketball game against Long Beach last March 9. Plaintiff and his family regularly attend the annual Picnic Day in April and the Whole Earth Festival in May. Defendants intend for members of the public who live nearby,

including Plaintiff, to come onto campus regularly to attend and participate in events, including political demonstrations and discussions, and Defendants knew that members of the public had in fact done so to participate in the Encampment. As a result, Plaintiff's presence on campus made him an intended beneficiary of the campus programming supported, in part, by the receipt of federal funds.

56.    Defendants' conduct knowingly excluded Plaintiff, a Jew and a Zionist, from "participation" in this civic discourse by refusing to allow him to engage *directly* with those within the Encampment. (This is also "discrimination" under the statute.)

57.    Defendant's conduct knowingly excluded Plaintiff, a Jew and a Zionist, from the "benefits" of demonstrating at the center of campus, reserving that for one viewpoint only. (This is also "discrimination" under the statute.)

58.    Defendant's conduct knowingly excluded Plaintiff, a Jew and a Zionist, from the center of campus and from traversing campus by way of its central artery, thereby "discriminating" against him on the basis of his race and national origin (actual and perceived).

59.    As a result of Defendants' conduct, Plaintiff has suffered significant injuries. This includes emotional distress for assault and battery, not to mention harassment, as well as for the imposition upon Plaintiff of second-class inferior status by the State institution he calls home.

60.    Without a declaration that the Encampment, as allowed, violated the law, it is likely that a similar Encampment will be established this year.

**COUNT IV**
**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.**
**(On Behalf Plaintiff Against All Defendants)**

2D AM. COMPLAINT - 24

61.    Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs 1-60.

62.    Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

63.    Plaintiff is a disabled person as defined in 42 U.S.C § 12102, as he has "a physical impairment that substantially limits one or more major life activities." Specifically, Plaintiff has an impairment that severely limits his ability to walk. His impairment requires him to walk on even and stable ground, lest he lose his balance and fall. He cannot walk safely on grass. He cannot walk safely on decomposed granite. He needs the smooth and regular path of asphalt or concrete to maintain stability.

64.    The Quad is the focus of campus life at UC Davis. The ability to traverse the campus of UC Davis through the Quad is by way of a path that is the central artery of campus. Traversing the campus through the Quad on this path is an essential part of participation in campus life; the campus is designed with the centrality of the Quad in mind and operates in that fashion.

65.    The Encampment was designed to and did in fact, occupy the Quad in a way so as to cut off cross-campus access through its central artery. Guards at stations on both sides of the Encampment at the central artery made sure that only those who expressed hostility to Israel could enter the Encampment on one side and traverse the Quad to as to exit on the other.

66.    Plaintiff wanted to use the main artery that runs through the Quad to traverse campus but was told to go around it.

67.    Plaintiff told the members of the Encampment that he wanted to do this but was blocked.

68.    When he complained to Defendants, Defendants told him, just like the Encampment told him, that he could simply go around the Encampment. Defendants provided no signage at the Encampment or explained the reasonable alternative to Plaintiff.

69.    In fact, there is no reasonable alternative to traversing the campus through the Quad: the Quad and the path that traverses are central to the campus, its identity and its community. Telling a disabled veteran he's free to use the campus otherwise is like telling an African American that if he sits in the back of the bus, he'll still get to his destination. It's like telling Jews that they should use the back entrance to the campus library.

70.    Practically too, Plaintiff could not just "go around" the Encampment, and he told Defendants so. He could not circumvent the Encampment by walking on the grass. He could not use nearby alternate paths because they were made of decomposed granite. These were the only practical alternatives that would not require extraordinary physical effort. The fact that it was possible for Plaintiff, in Defendants' view, to get to where he wanted to go by way of a long detour does not make it reasonable.

71.    Because of the blockade at the center of campus, Plaintiff has been "excluded from participation in" and "be[en] denied the benefits of the services, programs, or activities of a public entity."

72.    Plaintiff filed an ADA discrimination complaint with the Justice Department's Civil Rights Division May 10, 2024 and advised Defendants later that day that he had done so.

2D AM. COMPLAINT - 26

73.    The law is sufficiently clear: the conduct alleged herein violates the ADA. It is not just that the law is clear; the law has been applied consistently by Defendants until it adopted and promoted the Encampment. This knowledge makes it particularly appropriate to impose liability on Defendants personally.

74.    As a result of Defendants' conduct, Plaintiff has suffered significant injuries. This includes emotional distress for assault and battery, not to mention harassment, as well as for the imposition upon Plaintiff of second-class inferior status as a disabled vet by the State institution he calls home.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that this Court order the following relief:

A.    Declaratory judgment that the Encampment as allowed violated the Equal Protection Clause, that the Encampment as allowed violated the Free Exercise Clause, that the Encampment as allowed violated Title VI, and that the Encampment as allowed violated the ADA.

B.    Because without this Court's intervention, the Encampment is likely to resume, an injunction is required enjoining Defendants from permitting the Encampment to obstruct the central artery of UC Davis and the Quad so as to violate the Equal Protection Clause, from permitting the Encampment to obstruct the central artery of UC Davis and the Quad so as to violate the Free Exercise Clause, from permitting the Encampment to obstruct the central artery of UC Davis and the Quad so as to violate Title VI and from permitting the Encampment to obstruct the central artery of UC Davis and the Quad so as to violate the ADA.

C. Compensatory financial relief.

D. Punitive and/or exemplary damages.

E. Nominal damages, both in an amount sufficient to compensate for violation of Plaintiff's legal rights, and on a daily basis, for the period of the Encampment.

F. Plaintiff's reasonable attorneys' fees pursuant to statute.

G. Any other relief which this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs respectfully request a jury trial on all issues triable thereby.

Dated this 4th of March, 2025.

/s/ David M. Rosenberg-Wohl

David M. Rosenberg-Wohl

HERSHENSON ROSENBERG-WOHL
A PROFESSIONAL CORPORATION

2D AM. COMPLAINT - 28